746 So.2d 1162 (1999)
Patrick Joseph SMITH, II, Appellant,
v.
STATE of Florida, Appellee.
No. 98-1315.
District Court of Appeal of Florida, First District.
December 1, 1999.
Rehearing Denied January 11, 2000.
*1163 Robert Augustus Harper and Steven Brian Whittington of Robert Augustus Harper Law Firm, P.A., Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General and Bart Schneider, Assistant Attorney General, Office of the Attorney General, Tallahassee, for Appellee.
*1164 PADOVANO, J.
Patrick Smith, the defendant, appeals his convictions for first degree murder and armed robbery. We affirm. Of the four points raised on appeal, we find that only one merits discussion. The defendant contends that the trial court erred in admitting into evidence the pretrial statement of a codefendant. He argues that the statement was not a declaration against penal interest, as the trial court ruled, and that the admission of the statement deprived him of the right to confront the witnesses against him. We agree that the trial court erred in admitting the codefendant's statement in evidence, but we conclude that the error was harmless beyond a reasonable doubt. Therefore, we affirm.
The state did not seek the death penalty on the murder charge and ultimately agreed that the evidence against the defendant was insufficient to support a finding of premeditation. However, the state argued that the defendant was guilty of first degree murder, because he participated in the armed robbery that led to the victim's death. The trial consisted of a series of witnesses who testified to the same event but gave differing versions of the defendant's participation.
Sean Bradley, the victim of the robbery, lived in a mobile home in Niceville with his fiancé, Nicole Darnell, and their friend David Lawrence, the victim of the homicide. Bradley was unemployed and supported himself by selling marijuana. He testified that a young Asian man, later identified as Harry Tipton, came to his home on December 3, 1996, and asked if he had any marijuana for sale. Three other young men entered the residence along with Tipton. Bradley could give only a general description of these men, but they were all identified by other witnesses. According to Bradley, one of the men was a heavier set Asian (Robert Wolf), one was a shorter Asian (Chris Kerr), and one was an African American (the defendant). In response to Tipton's inquiry, Bradley produced three quarterounce bags of marijuana and placed them on the coffee table in the living room.
The men were inspecting the marijuana when, according to Bradley, the African-American man stood up and pulled out a gun, pointed it at Bradley's head and said, "We're going to take your shit." Bradley put his hands in the air and said, "Fine, take it." David Lawrence had been sleeping in another room but he woke up and was walking down the hallway toward the living room just as the men were about to take the marijuana. As Lawrence approached, one of the men said, "What are you doing? We'll shoot you," or words to that effect. Lawrence responded, "If you're going to shoot me, shoot me." At that point Bradley heard the sound of a gunshot, and Lawrence fell to the floor.
Bradley did not see who fired the gun. He explained that when the shot was fired, he was looking out the window to see if Nicole was coming home from school. When he turned around, however, he saw Harry Tipton holding the gun. Tipton then pointed the gun at Bradley, who curled up in a ball. The men left, and Bradley got up and locked the door. He noticed that the marijuana he had placed on the coffee table was gone. Bradley called 911, but Lawrence died of the gunshot wound despite the efforts of the emergency technicians.
Several days later, Investigators Mark Young and Larry Ashley of the Okaloosa County Sheriffs Department questioned the defendant. They advised the defendant of his rights, and he signed a waiver indicating that he would make a statement. At first, the defendant told the investigators that he had never seen the gun until the day of the shooting. He said that on that day, Harry Tipton, Rob Wolf, and Chris Kerr came to his house and picked him up in Tipton's car. They were all going out to buy some marijuana. While the men were in Bradley's home negotiating the purchase of the marijuana, Tipton *1165 pulled out a gun, and three seconds later a shot went off.
The investigators then told the defendant that Bradley had said that it was the African-American man who had held the gun on him. At that point, the defendant revised his statement. He then said that Tipton had handed him a pistol from under the car seat and told him to carry it into the mobile home and to pull it out when they saw the marijuana. Tipton also told him that the gun was necessary, because the people inside might be armed. The defendant tucked the pistol into his waistband and later pulled it out and pointed it at Bradley as instructed. The defendant attempted to chamber a round but he did not know how to operate the pistol. Tipton then took the pistol from the defendant. When Lawrence came out from the bedroom, Tipton shot him. At that point, Robert Wolf grabbed the marijuana, and they all ran out of the house.
After the defendant's two narrative accounts of the incident, the investigators asked him whether either Sean Bradley or David Lawrence had a gun. Investigator Young testified that the defendant then said Bradley had a gun and that he was going for it when the defendant pulled out Tipton's pistol. Investigator Ashley then asked the defendant if he could record the interview. The defendant agreed, and the investigators made a tape recording, which the state later used in evidence at trial.
Robert Wolf entered a plea of no contest to manslaughter and agreed to testify for the state. The essence of his testimony was that the defendant knew about the plan to commit a robbery and that the defendant actively participated in the robbery. Wolf said that he, Tipton, and Kerr were talking about "hitting a couple of licks," which meant robbing a couple of drug dealers. They went to the defendant's house and discussed the plan with him, and then the defendant joined them in Tipton's car. Wolf testified that Tipton gave the defendant a gun and the defendant pulled the gun on Bradley and demanded the marijuana. When Tipton shot Lawrence, Wolf grabbed the marijuana, and all four men ran to the car and went back to Tipton's house. According to Wolf, they split up at that time but met again later and smoked the marijuana. When they heard that Lawrence had died, they all went to the Cinco Bayou, and Wolf tossed the gun into the water.
A dive team located the gun and retrieved it from the Bayou. At trial, the state called a firearms expert who testified that a shell casing found in Bradley's mobile home was ejected from the gun that had been retrieved by the dive team. The investigators searched Bradley's home after the homicide but they testified that they did not find another gun. Nicole Darnell testified that she had never known Bradley to keep a gun in the house.
The state called Harry Tipton as a witness out of the presence of the jury, but Tipton refused to testify. When asked if he was prepared to answer questions about the offenses, Tipton said, "No sir. I can't honestly say I'd tell the truth. I feel that if I did testify, I'd perjure myself, sir." The trial judge then instructed Tipton that if he did not agree to testify he could be held in contempt, but again Tipton declined. The jury did not hear any part of this testimony. Tipton's refusal to testify would later be used as a predicate for the admission of his pretrial statement.
The defendant took the witness stand in his own defense and testified that his initial discussion with Tipton was not about a robbery, but rather about a plan to purchase some marijuana to celebrate Tipton's birthday. When the four men arrived at Bradley's mobile home, Tipton reached under the seat, pulled out a gun, and told the defendant to hold the gun in case the people inside tried to rob them. According to the defendant, Tipton said the gun was not loaded and that it was just for show. The defendant agreed to hold the gun, and he stuck it in his waistband and went inside with Tipton.
*1166 While the men were engaged in a preliminary discussion about the marijuana, Tipton said "He's got a gun," referring to Bradley. The defendant said that he saw Bradley reaching for the gun, so he pulled out the gun Tipton had given him. At that point, Bradley put his hands up, and the defendant told him to "drop the weed." The defendant explained that he told Bradley to drop the marijuana, because he was afraid Bradley would throw it at him, get his gun, and shoot him.
Tipton then told the defendant that he had to cock the gun, but the defendant did not know how. The defendant said that he had never used a gun before. Tipton grabbed the gun from the defendant and at that point David Lawrence walked out of his room, and Tipton pointed the gun at Lawrence. Lawrence said something like "Shoot me," and the gun discharged. The defendant ran out of the house and had no further contact with Tipton, Wolf, or Kerr. He denied smoking any of the marijuana and claimed that he did not even know it had been taken until the police told him. He also denied being present when the gun was thrown into the Cinco Bayou.
On rebuttal, the state sought to introduce an edited version of Harry Tipton's pretrial statement to Sheriffs investigators. In the original tape recording, Tipton said that all four men were involved in planning the robbery. The edited version was the same in all respects, except that all references to the defendant were deleted. The prosecutor argued that Tipton's statement was relevant to rebut the defendant's trial testimony, because it was unreasonable to assume that three men planning a robbery would give the gun to another person who was not aware of the plan.
Defense counsel objected on the ground that Tipton's pretrial statement was hearsay. In response, the state argued that the statement was admissible as a declaration against penal interest. Furthermore, the prosecutor argued that the admission of the edited tape recording would not violate the defendant's right to confront the witnesses against him, because all references to the defendant had been deleted. The trial court agreed with the state and ruled that the statement was admissible in evidence.
After the trial court's ruling on the admissibility of the statement, the prosecutor asked whether the defense wanted the court to inform the jury that the tape had been edited, to explain why it was so short and why it had several gaps in it. Defense counsel stated that he would be satisfied if the court were to advise the jury that the tape was a redacted tape and had been edited to take out any reference to anyone other than Harry Tipton. The prosecutor pointed out that such an instruction would be inaccurate, because the tape mentioned Wolf and Kerr and that the only person who was not mentioned was the defendant. Defense counsel responded, "Your Honor, that is more accurate."
Before the taped statement was played for the jury, the court gave the following instruction:
Ladies and gentlemen, as you gleaned from the testimony of Investigator Young, you're getting ready to hear a tape of a statement made by Harry Tipton, and as you've learned, it's what Mr. Elmore and Investigator Young call a redacted tape. That means it's been sanitized. There are parts of it that are gone. There are gaps in there. It'll sound to you as an incompleteit's very short, and it's incomplete, but the portions that you will hear are true and correct and accurate as to those portions actually played. You'll hear Mr. Tipton speaking and making his statement. You'll hear references to persons that you already heard about, persons by the name of Kerr and Wolf. So the version that you hear is going to only relate to three of the four participants, Tipton, Kerr and Wolf. The gaps involve other people. Can I make that any clearer?
*1167 The prosecutor then stated, "Judge, only that all references to Patrick Smith have been removed." The judge then instructed the jury, "Those are the cause of the gaps. Do you understand that? Those are matters in which Mr. Smith's name is mentioned, and we're keeping his name out from your hearing." The court then asked defense counsel, "Mr. Flowers, can I make it any more clear?" Defense counsel responded, "No, Your Honor."
Harry Tipton's taped statement was then played for the jury. On the tape, Investigator Ashley asked Tipton to give his account of the homicide and robbery. Tipton's entire statement, as played for the jury, was as follows:
Yes. I met some people a couple months ago, I believe, and my friends went up there and bought, like, a half ounce off of him. I met them at this time. I went there once after that to get a sack, and they didn't have none, and he remembered me, and I just left and didn't think nothing of it, and the morning of the shooting, Tuesday morning, a friend, Chris Kerr, came over and woke me up. He came in, and we just fell back asleep. We woke up around 11:00, 11:30, something like that, because another friend of mine, Robert Wolf, came over, and he said, it's payday. He wanted to go jack somebody, and me and Chris, you know, we didn't have much money or anything on us, so, being stupid, we did it, too. We drove around for a while, we talked about it. Rode out there to Niceville. We were up in there, and he showed us the weed, and I pulled out some money, and then his roommate walked out, looked like he just woke up, like mad or something, and he's likeI pointed the gun at him and told him to sit down, and he's like, you're going to have to shoot me, and then I just kept the gun pointed on him, and he walked at me at a fast pace, and as soon as thehe bumped into the gun. It just went off, and I didn't know what to do really. I just looked down. He was still alive. He was on the ground, and then I saw blood just started coming out. I got scared.
The jury found the defendant guilty of first degree murder and robbery with a firearm. He was sentenced to a term of life on the murder charge and a concurrent term of nineteen years and two months on the armed robbery charge. The defendant then filed a timely direct appeal to this court.
We conclude that Tipton's extrajudicial statement to the investigators was hearsay and that it should not have been admitted in evidence against the defendant. Section 90.804(2)(c), Florida Statutes, creates an exception to the hearsay rule for statements against penal interest, but Tipton's statement does not meet the requirements for the use of this exception. A party who offers to introduce a statement on the ground that it is a declaration against penal interest must show: (1) the declarant is unavailable as a witness, (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in the same position would not have made the statement unless he or she believed it to be true, and (3) the statement is corroborated by circumstances that clearly indicate its trustworthiness. See Maugeri v. State, 460 So.2d 975 (Fla. 3d DCA 1984) (adopting the test in United States v. Riley, 657 F.2d 1377 (8th Cir.1981)). In the present case, the state showed that Tipton was unavailable but failed to establish that a reasonable person would have believed his statement to be true or that his statement was trustworthy.
In determining whether a reasonable person would have believed the declarant's statement to be true, we must consider the circumstances existing at the time the statement was made, as well as the content of the statement. Section 90.804(2)(c), Florida Statutes allows the admission of a hearsay statement only if the statement was contrary to the declarant's interest "at the time of its making." *1168 The theory underlying this exception to the hearsay rule is that people are not likely to make statements harmful to their own interest unless they have good reason to believe those statements are true. See Charles W. Ehrhardt, Florida Evidence § 804.4 (1999 ed.). It follows that the person making the statement must have understood the potential harm at the time the statement was made. See John W. Strong, McCormick on Evidence § 319(a) (5th ed.1999). A statement does not qualify as a declaration against penal interest merely because it later proves to be harmful.
Whether Tipton understood that his statement was a confession to murder is not clear. He admitted that he was guilty of the robbery, but it appears from his statement that he was trying to absolve himself of criminal responsibility for the murder. When he spoke of the murder, he said that "[Lawrence] bumped into the gun. It just went off, and I didn't know what to do really." As a matter of law, Tipton's confession to the robbery was a confession to the murder, as well, but he would not have known that unless he understood the operation of the felony murder rule at the time he spoke with the investigators. He may have been unaware of the felony murder rule. If so, he would not be the first defendant who unwittingly confessed to murder thinking that he was admitting only a less serious offense. The record does not disclose any fact or circumstance to suggest that Tipton understood the potential harm he caused to himself by making the statement. Consequently, we cannot say with any confidence that a reasonable person in his position would have thought that the statement was true.
The applicability of the exception for a statement against penal interest also depends on the content of the incriminating declaration. Section 90.804(2)(c) uses the term "statement" in a narrow sense to refer to a specific declaration or remark incriminating the speaker and not more broadly to refer to the entire narrative portion of the speaker's confession. See Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (interpreting the same language in rule 804(b)(3) of the Federal Rules of Evidence). If a part of what the declarant has said is exculpatory, the statement is not entirely self-inculpatory, and it is not therefore admissible under the statement against penal interest exception. An attempt to minimize criminal liability removes the sole justification for allowing the declarant's statement in evidence. Likewise, a statement against penal interest may not be truly self-inculpatory if the declarant has implicated a third party in the process of making his own admission. See Williamson, 512 U.S. at 601, 114 S.Ct. 2431. Here again, an attempt to shift the blame to another, even in part, undermines the very foundation of the exception.
In the statement at issue here, Tipton not only incriminated himself, but he also incriminated his codefendants Wolf and Kerr. To that extent, his statement was not truly self-inculpatory. Moreover, Tipton's statement contains both inculpatory and exculpatory parts. He appears to have admitted the robbery to make his exculpatory statement about the murder more credible. As the Supreme Court noted in Williamson, "One of the most effective ways to lie is to mix falsehood with the truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." 512 U.S. at 599-600, 114 S.Ct. 2431. On the facts of this case we are unable to conclude that a reasonable person would have thought that Tipton's entire statement was true.
Nor did the state show that the statement was corroborated by circumstances that clearly indicate its trustworthiness. See Maugeri, 460 So.2d 975. In fact, the circumstances point to a contrary conclusion. Tipton was a suspect in police custody at the time the statement was made. Although a custodial statement made by a suspect is not necessarily untrustworthy, *1169 the courts should exercise great caution when admitting such a statement as a declaration against penal interest. As the United States Supreme Court observed in Lee v. Illinois, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), "the arrest statements of a codefendant have traditionally been viewed with special suspicion." The courts have good reason to be suspicious of a statement made by a person in police custody, because "the statement or parts of it implicating others very likely were made to curry favor even if it also inculpates the declarant." John W. Strong, McCormick on Evidence § 319(d) (5th ed.1999).
These fears are shown to be well founded in the present case. When Tipton took the witness stand during the state's proffer, he told the trial judge, "I can't honestly say I'd tell the truth. I feel that if I did testify, I'd perjure myself, sir." Despite this warning, the prosecutor pressed the trial court to admit the statement Tipton had made earlier to the Sheriff's investigators. To justify the use of the statement as a declaration against penal interest, the state would have had to present some evidence that it was trustworthy; yet the circumstances clearly suggest that the statement might not have been true. If Tipton would have lied under oath in court as he conceded, he might also have lied to the police.
On a point closely related to our hearsay analysis, we also conclude that the admission of Tipton's statement violated the defendant's constitutional rights under the Confrontation Clause of the Sixth Amendment. Although state hearsay rules protect similar values, see California v. Green, 399 U.S. 149, 155, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the United States Supreme Court has been careful not to equate a hearsay violation with a Confrontation Clause violation. See White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).
The protection afforded by the Confrontation Clause includes the right to cross-examine witnesses. See Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This right is often asserted as a reason for excluding an extrajudicial statement by a codefendant. See, e.g., Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). If the codefendant is not available for cross-examination, the defendant has no effective means of challenging the statement. In the leading case of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the harm caused by the admission of a codefendant's statement incriminating the accused cannot be cured by a limiting instruction.
It is possible to avoid a Bruton violation by redacting from the codefendant's statement all references to the defendant on trial. Such a statement may be admissible if the facts related by the codefendant serve as a link to other evidence against the accused. See Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). However, the redaction of the defendant's name from a codefendant's confession will not cure a Bruton problem if the jury could infer that the codefendant incriminated the defendant in the original version of the statement. As the Supreme Court explained,
redactions that replace a proper name with an obvious blank, the word "delete," a symbol, or similarly notify the jury that a name has been deleted are similar enough to Bruton's unredacted confessions as to warrant the same legal results.
Gray v. Maryland, 523 U.S. 185, 195, 118 S.Ct. 1151, 1156, 140 L.Ed.2d 294, 302 (1998). We recently applied the rule in Gray to a case in which a statement made to a policeman created an immediate inference that the declarant had incriminated the defendant on trial. See Jones v. State, 739 So.2d 1220 (Fla. 1st DCA 1999).
*1170 In the present case, the redaction did not cure the Bruton violation, because it was obvious that the passage deleted from the tape recording was an incriminating reference to the defendant. If the jurors had any doubt about that, it was removed by the trial court's instruction. The trial judge told the jury that Tipton's statement had been "sanitized" and that "[t]here are parts of it that are gone." He said that the version of the statement the jurors were about to hear would relate only to "three of the four participants, Tipton, Kerr and Wolf," and then explained "The gaps involve other people. Can I make that any clearer?" Apparently not satisfied with the implication, the prosecutor responded, "Judge, only that all references to Patrick Smith have been removed." The judge then instructed the jury, "Those are the cause of the gaps. Do you understand that? Those are matters in which Mr. Smith's name is mentioned, and we're keeping his name out from your hearing." Under these circumstances, we think that any juror would have understood that Tipton had incriminated the defendant. Here, as in Gray, the omission of the defendant's name from Tipton's statement did not cure the Bruton violation.
We recognize that there are circumstances in which a statement by a nontestifying codefendant can be admitted as evidence without violating the confrontation clause. The United States Supreme Court held in Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) that a hearsay statement may be admissible under the Confrontation Clause if the statement has sufficient indicia of reliability. The Court explained that this requirement can be satisfied by showing that the statement falls within a firmly rooted exception to the hearsay rule, or by showing that the statement has particularized guarantees of trustworthiness. In making this determination, the trial court may consider only the circumstances surrounding the making of the statement and those that bear on the credibility of the declarant. See Wright, 497 U.S. at 819, 110 S.Ct. at 3148.
Applying these principles, we conclude that Tipton's statement is not supported by sufficient indicia of reliability. The statement was offered into evidence as a declaration against penal interest, but as the Florida Supreme Court held in Franqui v. State, 699 So.2d 1312, 1319 (Fla. 1997), the declaration against penal interest exception in section 90.804(2)(c) is not a "firmly rooted" exception to the hearsay rule. Consequently, we could eliminate the statement against penal interest exception as a method of establishing the reliability requirement set out in Wright even in a case in which the exception applied. A statement against penal interest, though admissible under the rules of evidence, may be subject to exclusion as a violation of the Confrontation Clause.
Nor is the reliability requirement of Wright satisfied in this case by the circumstances relating to the making of the statement or the credibility of the declarant. The statement was not a genuine confession of guilt of the kind that might be made to friend or relative. Rather, it was an equivocal statement to a law enforcement officer by a person who was in custody on a serious charge. As we have explained, a reasonable person would have good cause to question the reliability of the statement. Moreover, there is no evidence to suggest that the declarant was believable. To the contrary, the declarant conceded that he was willing to lie under oath to serve his own interests.
Although the admission of Tipton's statement violated the Confrontation Clause of the Sixth Amendment, as well as section 90.804(2)(c) of the Florida Evidence Code, we are convinced beyond a reasonable doubt that the improper admission of the statement was harmless. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). An extrajudicial statement by a codefendant incriminating the defendant on trial is no longer admissible merely *1171 because it interlocks with the defendant's own statement, but it is still proper for an appellate court to consider the interlocking nature of the statements in determining harmless error. See Wright; Franqui. Here, the incriminating fact implied in Tipton's statement (that the defendant participated in the robbery) was directly established in the defendant's own statement. Additionally, the defendant's participation was established by another defendant, Robert Wolf, who testified at trial and was subject to cross-examination, and by forceful circumstantial evidence including Bradley's testimony that it was the African-American man who forced him at gunpoint to give up the marijuana. For these reasons, we are confident that the error in admitting Tipton's statement had no effect on the outcome of the trial.
In summary, we conclude that Tipton's statement did not qualify as a statement against penal interest and that its admission violated the defendant's rights under the Confrontation Clause. Because Tipton's statement established no more than that which the defendant had conceded in his own statement to the investigators, its admission was harmless beyond a reasonable doubt.
Affirmed.
ERVIN and LAWRENCE, JJ., CONCUR.