980 So.2d 1126 (2008)
Manuel PEREZ, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D06-356.
District Court of Appeal of Florida, Third District.
March 19, 2008.
*1128 Robbins, Tunkey, Ross, Amsel, Raben & Waxman and Benjamin S. Waxman, for appellant.
Bill McCollum, Attorney General, and Stormie Stafford, Assistant Attorney General, for appellee.
Before COPE and SUAREZ, JJ., and SCHWARTZ, Senior Judge.

ON REHEARING GRANTED
SUAREZ, J.
On consideration of the appellant's motion for rehearing, the Court grants the motion for rehearing, withdraws the opinion issued on December 5, 2007, and substitutes the following opinion.
The defendant appeals convictions and sentence for attempted second-degree murder with a firearm and aggravated battery. We affirm the convictions and sentence.
On October 5, 2004, at approximately 9:00 a.m., Orestes Machado was working near his garage at his Miami Lakes home when three armed, masked men robbed him. During the robbery, he was hit on the head with a gun and shot in the chest and forearm. Machado shot two of the robbers. He saw the robbers escape in a white Nissan or Toyota which was parked in front of his house. On October 7, 2004, investigating Detective Ballata spoke to the victim who communicated that he had shot two of his attackers, described their height and weight, and described the car they were driving. Ballata received a lead that the Nissan Maxima was registered to Manuel Martin. Martin told Ballata that he had given the car to Hector Laurencio, and he gave the detective a picture showing the defendant and suspect Laurencio together. Martin stated that Laurencio had told him that he was involved in a robbery with another man, "The Fish," or Salgado. Ballata next discovered that, on the night of the incident, Manuel Perez was admitted to Hialeah Hospital emergency room with a gunshot wound and was later transferred to Jackson Ryder Trauma Center for treatment. On November 16, 2004, Detective Ballata arrested Manuel Perez and took him into custody. Ballata administered the defendant's Miranda[1] rights. During questioning, the defendant invoked his right to counsel, and Ballata ceased conversation and started to leave the room. As Ballata was walking out, the defendant stopped him and asked what charges would be filed against him. Ballata showed him a photograph of Laurencio and told him that he and Laurencio were being charged with a home-invasion robbery. The defendant denied knowing Laurencio. Ballata then showed him the picture of the defendant and Laurencio together. The defendant responded that it was taken before Laurencio went to jail. There was no further conversation, and the Detective left the room. Ballata obtained the cell phone records of the defendant's brother, Miguel Perez, which showed that calls were made between Laurencio, Salgado and Miguel Perez on the day of, and about the time of, the robbery. Manuel Perez and Laurencio were charged with the attempted second-degree murder of Orestes Machado.
The defendant moved to suppress his post-arrest statements, first denying that he knew Laurencio and then acknowledging that the photograph depicting the two of them together was taken before Laurencio went to jail. The trial court denied the motion. He then filed a motion in limine to exclude the introduction of the cell phone records, which also was denied by the trial court.
*1129 At trial, over defense objection, cellular telephone records custodians were permitted to testify from the cell phone records of Miguel Perez, Laurencio, and Salgado as to the time of calls between the three and also as to the physical location of the cell towers receiving and transmitting each call. The records custodian from Sprint-Nextel testified that persons making and receiving cell calls would physically be not more than three miles from the receiving tower.
Manuel Martin testified, over objection at trial, that Laurencio had admitted to him that he used the Maxima in the robbery, and that he committed the robbery with someone named "The Fish." Martin further testified that the defendant and Laurencio were friends from Cuba, and that he had seen them together on occasion. "The Fish" was identified as Orlando, who used the last names of Alfonso and Salgado. The trial court gave a limiting jury instruction that the statements made by Laurencio were not to be considered evidence of the guilt of the defendant. The evidence at trial further showed that the defendant had removed a bullet from himself on the day of the robbery before going to Hialeah Hospital to be treated. Miguel Perez testified that the defendant told him that he had been shot on 79th Street, in Miami, while someone tried to rob him. Miguel Perez could not explain the cellular phone calls between himself, Laurencio and Salgado made at or near the time of the robbery.
The defendant was found guilty of attempted second-degree murder with a firearm and aggravated battery. He was sentenced to twenty-five years in prison on the attempted second-degree murder charge and fifteen years on the aggravated battery charge to run concurrently. He raises three points on appeal of his convictions and sentence.

I.
Perez first contends that the trial court erred in failing to suppress his post-arrest statements made to Ballata that he did not know Laurencio and that a picture depicting the two of them together was taken before Laurencio went to jail. He argues that, after he already had invoked his right to silence and counsel, Ballata's use of the pictures of Laurencio was tantamount to custodial interrogation in violation of his right to remain silent and his right to counsel.
The State responds that, after fully being advised of his Miranda rights and with full knowledge, the defendant initiated contact with the officers by asking about the nature of the charges against him after they had already ceased interrogation. Therefore, his statements were spontaneous, and the initiation of contact served as a knowing, intelligent and voluntary waiver of counsel.
We review the denial of the motion to suppress below by according a presumption of correctness to the trial court's findings of fact. See Parker v. State, 873 So.2d 270 (Fla.2004). We view the evidence and reasonable inferences in a manner which gives great deference to the trial court's rulings. State v. Gelin, 844 So.2d 659 (Fla. 3d DCA 2003).
We find that the trial court was correct in denying the motion to suppress the defendant's statements made to Detective Ballata after he invoked his right to remain silent and his right to counsel under Miranda. We disagree with the inference that showing the picture of Laurencio, in response to the defendant's question about his charges,[2] or showing the subsequent picture of the defendant with Laurencio constituted a continuation of interrogation in violation of his rights under *1130 Miranda. When the defendant invoked his right to counsel, the detective ceased any further conversation and prepared to leave the room. The defendant then initiated the conversation by asking about the charges. Therefore, the detective could not have intentionally planned to introduce the photographs to elicit an incriminating response when he did not even know he would have a further opportunity to do so after interrogation had ceased. The trial judge correctly found that Ballata's action of showing the photographs to the defendant was not the functional equivalent of interrogation because the defendant was the one who initiated the conversation and not the detective. We hold that the defendant's question as to what charges were being brought against him constituted an initiation of the conversation with police after the giving of Miranda warnings, and his statements were properly admitted. See Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); Bassett v. State, 449 So.2d 803 (Fla.1984); Bryan v. State, 947 So.2d 1270 (Fla. 5th DCA 2007). Compare Dixon v. State, 816 So.2d 172 (Fla. 4th DCA 2002) (police rather than defendant reinitiated contact with the defendant). See generally Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

II.
The defendant next contends that the trial court abused its discretion in allowing *1131 cellular telephone records custodians to testify that persons who placed cell phone calls would be within a certain distance (one to three miles) from the cell towers identified with those calls. The cell phone records of Miguel Perez, Laurencio and Salgado were introduced at trial. The records included account information, a list of cell phone tower locations in Miami-Dade County, Florida, and a log of incoming and outgoing calls on October 5, 2004, from their cell phones. Both cell phone companies' records indicated the times of the calls, the duration, and the identity and location of the tower receiving and transmitting the calls. The defendant argues that the records custodians' testimony regarding how far a hypothetical caller would be from the phone tower was testimony beyond their expertise and personal knowledge, and, therefore, should not have been admitted as a business records exception to the hearsay rule. See § 90.803(6), Fla. Stat. (2007).
The State responds that the records were created in the regular course of business activity upon receiving or sending a call. Thus, they were admissible under subsection 90.803(6). The cell phone information combined with the records of the locations of the cell phone towers was sufficient for jurors to ascertain the location of the calls with respect to the location of the towers without the necessity of expert testimony.
We find that the testimony of Donna Plasmir and Janan Chandler, the records custodians from Sprint-Nextel and Metro PCS, did not constitute expert testimony under section 90.702, Florida Statutes (2007), and therefore was properly admitted. As in Gordon v. State, 863 So.2d 1215, 1219 (Fla.2003), the record demonstrates that Plasmir "simply factually explained the contents of phone records." As in Gordon, the custodians factually compared the locations on the phone records to locations on the cell site maps. Plasmir testified that a typical cell site covered an area of one to three miles.[3] She then stated that the record for a particular cell phone details the actual cell tower off of which the call bounces. This testimony constituted general background information interpreting the cell phone records which did not require expert testimony. It did not reveal the precise location within that one to three mile radius from which the calls were generated. It only served to explain the concept of a cell site and how it generally related to cellular telephone company records.[4] Moreover, *1132 there was no direct evidence presented by the defendant to dispute these generalized facts or question their validity. Compare United States v. Sepulveda, 115 F.3d 882 (11th Cir.1997) (holding that scientific cell site analysis is necessary to determine liability for unauthorized use of cellular air time). A juror's own knowledge, experience and familiarity with the addresses of the receiving cell towers themselves as shown on the site map coupled with the familiarity of the location of the origin of the calls were sufficient for each juror to determine the location of the tower without the need for expert testimony. See McGough v. State, 302 So.2d 751 (Fla. 1974). Therefore, the trial court did not abuse its discretion in overruling the defendant's objections and denying the defendant's motion for mistrial where the cell phone records and accompanying testimony were properly introduced.

III.
Third, the defendant contends that the trial court erred in overruling his objection to exclude Martin's testimony that Laurencio, who did not testify at trial, told Martin that he had "done a robbery in Miami Lakes," and that "The Fish," later identified as Salgado, participated in the robbery. The defendant argues that the introduction of the statements was in violation of the hearsay rule, see § 90.801(1)(c), Fla. Stat. (2007), and his right to confront witnesses against him. See Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The defendant asserts error in the introduction of the statements since they served as a predicate for the cell phone record evidence which showed the stream of telecommunications between the participants in the home-invasion robbery.
The State responds that Martin's testimony containing Laurencio's confession, that he had committed the robbery and "The Fish" had accompanied him, was admissible. Laurencio first admitted to his participation in the crime and then, shortly thereafter, stated that the robbery was done with someone called "The Fish." The State relies on the proposition that the statements were neither testimonial in nature, under the proscription of Crawford, and therefore did not violate the Confrontation Clause, nor were unreliable, made *1133 under circumstances that would render them untrustworthy in contravention of section 90.804(2)(c), Florida Statutes (2007). The State contends that the subsection statements constitute an exception to the hearsay rule as contrary to the penal interest of the declarant because the statements by Laurencio were against Laurencio's penal interest as well as implicating "The Fish." See Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Since there was no mention or reference to the defendant in the statements, the trial court's limiting instruction, given to prevent the jury from using them as evidence of guilt of the defendant, served to eliminate any Confrontation Clause violation. See Smith v. State, 746 So.2d 1162 (Fla. 1st DCA 1999) (citing Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)).
We agree that the first part of the statement where Laurencio confessed to Martin to his own involvement in the robbery was admissible as an exception to Florida's hearsay rule, section 90.802, Florida Statutes (2007), as against Laurencio's penal interest. See § 90.804(2)(c), Fla. Stat. (2007). The statement exposed the declarant, Laurencio, to criminal liability and did not violate the Confrontation Clause.
We do not agree that the second part of the statement, expressing that "The Fish" was also a participant in the robbery, was properly admitted as an exception to the hearsay rule as it was not inculpatory as to the declarant, Laurencio. Non-self-incriminatory statements, even if they are made within a broader narrative that is generally self-inculpatory, are not admissible. Williamson, 512 U.S. at 594, 114 S.Ct. 2431. There is no reason why collateral statements, even ones that are neutral as to interest, should be treated any differently from other hearsay statements that are generally excluded. "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." Brooks v. State, 787 So.2d 765, 775 (Fla.2001) (citing Williamson). The collateral statement by Laurencio to Martin about "The Fish" was not made against the declarant's penal interest because it was not inculpatory as to Laurencio. The statement that "The Fish" participated in the robbery was hearsay and does not fall within an exception to the rule. Therefore, Laurencio's statement concerning "The Fish's" involvement in the robbery should have been excluded from evidence before the jury and the defendant's objection should have been sustained.
The trial court's admission of the hearsay statement nevertheless is subject to harmless error analysis. See Diaz v. State, 945 So.2d 1136 (Fla.2006). In view of the other evidence presented, we find the error to be harmless beyond a reasonable doubt. See § 924.051, Fla. Stat. (2007); Knowles v. State, 848 So.2d 1055 (Fla.2003); State v. DiGuilio, 491 So.2d 1129 (Fla.1986). Moreover, the statement did not implicate the defendant in the crime.
The defendant's convictions and sentence for attempted second-degree murder with a firearm and aggravated battery are affirmed.
NOTES
[1] Miranda v. Arizona, 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969).
[2] 

Q. And as a matter of fact, I think you indicated when you were questioned earlier, you had made some reference that you began to take your folder, put it together and you were walking out, right?
A. Yes.
Q. As and as you walked out, he asked you one thing. He asked you, what am I charged with?
A. Correct.
Q. And, Detective, from that one response, what am I charged with, you knew you had two pictures in your file right?
A. Yes.
Q. And you took out one picture in response to that question, right?
A. Correct.
Q. You didn't answer his question by saying, you're charged with attempted robbery, attempt felony murder or anything of that sort by itself. You took out a picture, right?
A. Yes, I showed him the picture in addition to telling him those things.
* * *
Q. And you knew you had two pictures, right?
A. Yes.
Q. So you logically took out one picture and it was the one picture of only Hector?
A. Correct.
Q. So you didn't take out both and put them down on the table, you took one out first?
A. That's true.
Q. And Detective, when you showed him that picture, you knew that picture would get a response one way or the other as to who that person was, right?
A. I wasn't sure what his response would be.
Q. But you were hoping you would get a response?
A. I showed him the picture to easily clarify what I had, yes.
Q. You were hoping that picture would get some kind of statement regarding who he is, who Hector is?
A. I just showed him the picture to show him what the evidence is that I had.
* * *
Q. So after he makes a statement regarding the one photograph, you then choose to take out the second photograph, correct?
A. That's correct.
Q. And that second photograph you knew had to logically relate to the first photograph, right?
A. That's correct.
Q. So you initially held back that second photograph until you got a response from the first photograph?
A. Yes.
Q. So you knew there was going to be some response to either of them?
A. Yes.
Q. And when you showed him the second picture it required an explanation for the first picture?
A. He didn't have to say anything. I just showed him the picture.
[3] 

Q. And with respect to those records can you tell the members of the jury, when somebody makes a cell phone call from Nextel, what are the steps that occur after a Nextel phone call is either made or received by that customer?
A. When a customer places the call it hits a switch. Periodically throughout the day that switch dumps it on to the 
Q. Let me just stop you for a second. When you say switch, you are referring to a cell tower, is that correct?
A. Uh-huh a cell tower.
Q. And Nextel has a good number of cellular towers within the geographic area of Dade County?
A. Yes, they do.
Q. And each tower is responsible for capturing the data of the calls that are made near that tower?
A. Yes, sir.
Q. Give the jury an idea as to the geographic area that each tower encompasses?
A. It's within one to three miles.
[4] The Metro PCS records custodians testified as follows:

Q. Let me show you what's been marked as Exhibit 3U for identification. Do you recognize that document?
A. Yes.
Q. What is it?
A. These have our cell towers addresses listed.
Q. And do these represent thea certain subset of cell towers in Dade County, Florida?
A. Yes, they do.
Q. Now it appears that there are four pages of documents. Can you tell the members of the jury what each of those four pages contains with respect to each one of those four pages?
A. On the first page, we have the cell tower address. From the last digits here (indicating) we have a system is that we use that we represent a plug. We plug the information in and it will come up with a street address as to where the cell site is located.
* * *
Q. And that's a call detail record that pertains to the date of October 5, 2004?
A. Yes, it does.
Q. Does that call detail record contain a compilation of all of the phone calls that the number (786) 229-5524 either made or received on the date of October 5, 2004?
A. Yes, it lists the inbounds and outbounds.
Q. And does that record also enable the person looking at it to determine the cell tower where the signal from the call bounced off of?
A. That's correct.
Q. How would one go about doing that if one were trying to find out where each of those phone calls were either made from or where the person received a phone call?
A. You would switch over to the back page. We have listed here the originating cell site, the terminating cell site, which I went over just a second ago which has the cell address which we reference by a street address.