On Motion for Clarification

CIKLIN, J.
We grant the motion for clarification, withdraw our previous opinion and substitute the following in its place.

Introduction

Lukens Petit appeals his convictions for one count of felony murder, three counts of attempted felony murder, and one count of armed robbery. Petit received a life sentence for the felony murder and thirty years for each of the remaining convictions, all to be served concurrently. While ultimately we affirm the convictions, we write to discuss the Confrontation Clause arguments raised by Petit. As for all other arguments Petit raises, we find them to lack merit and do not discuss them further.

Background

On July 14, 2007, armed gunmen robbed a carwash in Pompano Beach. After the suspects fled in a vehicle, two of the victims pursued them onto southbound 1-95 until the suspects took the Hollywood Boulevard exit. By this point, the suspects were being chased by police cars. The suspects ran through an intersection and crashed into a vehicle containing three individuals, all of whom were seriously injured. One of the individuals inside the suspects’ vehicle was killed in the accident as well.
After Petit was arrested for his involvement in the robbery and automobile collision, Edder Joseph, the owner of a carwash and one of the robbery victims, testified at Petit’s bond • hearing.[1] He said that he and his employee, Rubin Saint Remy, were at the carwash when a vehicle pulled in very fast; five men wearing homemade ski masks and holding guns, including at least one shotgun, got out of the vehicle and ordered everyone on the ground. The five men took Joseph’s'money, identification, and jewelry, got back into the vehicle, and fled the scene; Joseph and Saint Remy quickly entered one of the vehicles at the car-wash and pursued the suspects onto and down 1-95.
Joseph’s testimony at the bond hearing was read into the evidence at Petit’s trial because Joseph refused to testify. Sometime after the robbery, Joseph was the victim of a shooting, which he survived. Joseph then started living with various relatives and friends to elude authorities and anyone else. Petit objected to Joseph’s bond hearing testimony being admitted at trial, arguing that it violated the Confrontation Clause as understood in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The trial court overruled the objection, finding that the state demonstrated that Joseph was unavailable.
At the trial, audio recordings of four 911 calls were admitted into evidence and played for the jury. The first call came from an individual reporting the robbery. The second was a call back from the 911 operator after the first call was disconnected. The third call originated from Saint Remy as he and Joseph pursued the suspects on 1-95, and the fourth call was *910 initiated when the third call was disconnected and a 911 operator called back. Petit objected to all of these calls being admitted, arguing that they were Confrontation Clause violations under Crawford as well. The trial court found all of the calls to be nontestimonial because they were part of an ongoing emergency and admitted them.

Bond Hearing Testimony

Petit argues on appeal that Joseph’s statements at the bond hearing were im-permissibly admitted because they violated his Sixth Amendment[2] right to confront witnesses as explicated in Crawford. More specifically, Petit argues (1) the state did not prove Joseph’s unavailability, and (2) there was no meaningful opportunity for cross-examination at the bond hearing.
In State v. Belvin, 986 So.2d 516 (Fla.2008), our supreme court summarized the Crawford holding of the United States Supreme Court:
[I]n Crawford, the Supreme Court ... held the admission of a hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment if (1) the statement is testimonial, (2) the declarant is unavailable, and (3) the defendant lacked a prior opportunity for cross-examination of the declarant. The Court emphasized that if “testimonial” evidence is at issue, “the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.” Crawford, 541 U.S. at 68, 124 S.Ct. 1854. “Only [testimonial statements] cause the declarant to be a ‘witness’ within the meaning of the Confrontation Clause.” Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). “It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.” Id.
Id. at 520. The state concedes that Joseph’s statements at the bond hearing were testimonial, and we find no reason to question this concession. Therefore, the relevant inquiry regarding Joseph’s bond hearing testimony is whether the state proved Joseph’s unavailability and whether Petit had an opportunity for cross-examination.
“The trial court’s determination that a witness is ‘unavailable’ for confrontation purposes involves a mixed question of law and fact which this court reviews de novo, giving deference to the basic, primary or historical facts as found by the trial court.” Essex v. State, 958 So.2d 431, 432 (Fla. 4th DCA 2007) (citation and quotation marks omitted). Further, whether the bond hearing provided an opportunity for cross-examination for Confrontation Clause purposes is a purely legal question and should therefore be reviewed by this court de novo. See, e.g., Cromartie v. State, 70 So.3d 559, 563 (Fla.2011) (“The issue in this case is a pure question of law and therefore the standard of review is de novo.”).
As to the required analysis concerning unavailability in the instant case, the facts are uncontested. We must determine whether these facts could permit the trial court to find that the declarant, Joseph, was unavailable for Crawford purposes.
An investigator for the state attorney’s office testified that he was the individual responsible for locating Joseph. The investigator testified first about his interaction with Joseph back in March of 2009, *911 approximately six months before Petit’s trial. The investigator testified that Joseph was “scared to death” of testifying because “he had been shot several times because of just becoming involved with the police and he felt that testifying would be even worse.” According to the investigator, Joseph did not cooperate or agree to come to court. He said that he reached out to Joseph’s wife to try to locate Joseph the day before the trial. The investigator said that Joseph’s wife put Joseph on the phone at one point. Joseph told the investigator he was still frightened of testifying, that he thought this case was over because of a co-defendant’s trial, and that he lost his vision and had trouble walking as a result of being shot. Joseph said he was not living with his wife but was living with different relatives and friends to keep his location unknown. The investigator said that Joseph refused to testify and never disclosed his location. The investigator also said that it was “impossible” to find Joseph and that he “may be in deep hiding.” The investigator further testified that he served a subpoena on Joseph via his attorney back in March for a co-defendant’s trial and Joseph did not appear to testify.
On appeal, Petit argues that an individual can only be considered “unavailable” for Confrontation Clause purposes if he fits into any of the categories in section 90.804(1), Florida Statutes (2007). Section 90.804, however, defines “unavailability” of the declarant for the purpose of the hearsay exceptions. But the Florida Supreme Court has defined unavailability for Confrontation Clause purposes much more broadly than section 90.804(1): “In order for a witness to be unavailable for confrontation purposes, the State must make a good faith showing of attempting to secure the witness. This includes going to reasonable lengths to procure the witness.” State v. Johnson, 982 So.2d 672, 681 (Fla.2008) (emphasis added). Therefore, the only requirement here is that the state made a good faith effort to procure Joseph as a witness for the instant trial.
From the investigator’s testimony, we find that the trial court did not err in determining that the state made a good faith effort to locate Joseph for the trial. Therefore, the trial court, based on the particular facts of this case, correctly determined that Joseph was unavailable for the trial.
The remaining issue is whether the bond hearing at which Joseph testified provided Petit an opportunity for cross-examination. Petit argues that a bond hearing does not provide a meaningful opportunity for cross-examination as contemplated by the United States Supreme Court in Crawford. Specifically, Petit characterizes the Crawford holding as forbidding the admission of former testimony if “the former testimony is [not] obtained during a judicial procedure that is similar in motive to the trial.” However, this is a mischaracterization of the holding in Crawford. The Supreme Court has stated the cross-examination requirement in very general terms: “Our cases have thus remained faithful to the Framers’ understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.” Crawford, 541 U.S. at 59, 124 S.Ct. 1354. Crawford does not require similarity of motive in the previous judicial proceeding or mention a “meaningful” opportunity for cross-examination.[3]
*912 In Thompson v. State, 995 So.2d 532 (Fla. 2d DCA 2008), the Second District dealt with a similar issue. A victim’s testimony at an adversarial preliminary hearing was admitted at trial because the victim was murdered prior to trial. Id. at 533. The defendant argued that the admission of this testimony violated his confrontation rights under Crawford. Id. at 534. The court noted that Crawford required that prior testimony of an unavailable witness is only admissible if its “reliability [is] ‘tested in the crucible of cross-examination.’ ” Id. (quoting Crawford, 541 U.S. at 61, 124 S.Ct. 1354).
The Second District reviewed the relevant rule of criminal procedure dictating adversarial preliminary hearings and found that “[t]he rule places no limitations on the extent of cross-examination.” Id. The Second District concluded that no Confrontation Clause violation occurred in admitting the victim’s prior testimony from an adversarial preliminary hearing because the defendant had an opportunity for cross-examination at the hearing.
Petit cites to an older case from the First District, Nazworth v. State, 352 So.2d 916 (Fla. 1st DCA 1977). In Naz-worth, the defendant appealed the admission at trial of testimony taken at a bond hearing. Id. at 917. The witness’s testimony on direct and cross-examination at the bond hearing encompassed eight total transcript pages, but the state conducted a forty-two-page re-direct examination that was not subject to cross-examination and which was read into the record at trial. The First District found, “The extensive re-direct of [the witness] by the state after the limited cross-examination by [the defendant’s] counsel did not afford the defendant an opportunity for proper cross that would have been available had [the witness] testified at trial.” Id. at 918. Petit emphasizes the following language from Nazworth:
A bond hearing is for the purpose of setting bond. The inquiry conducted bears little or no resemblance insofar as defendant is concerned with trial.
Id. Nazworth is distinguishable for multiple reasons. First, it predates Crawford. Second, it does not appear to be a case dealing with the Confrontation Clause, but rather with the general admissibility of prior testimony under Florida common law. Third, in the instant case we are not presented with a lengthy re-direct examination which was not subject to cross-examination. Finally, Nazworth is brief and its analysis is quite limited. Thus, we find Nazworth inapplicable to the instant case.
We can find no Florida case addressing whether a bond hearing satisfies the requirement of an opportunity for the cross-examination as explained in Crawford. Therefore, we turn to relevant federal cases for guidance. The United States Supreme Court has explained that “the Confrontation Clause guarantees only ‘an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.’ ” Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)).
In U.S. v. Hargrove, 382 Fed.Appx. 765, 778 (10th Cir.2010), the Tenth Circuit stated the following clear understanding of the interplay of Crawford and other rules of evidence regarding cross-examination:
*913 Crawford requires only that the defendant have an opportunity to cross-examine the adverse witness at the prior proceeding — it does not require that the defendant have a similar motive at the prior proceeding. The pri- or motive requirement comes from the Federal Rules of Evidence, not the Confrontation Clause. See Fed.R.Evid. 804(b)(1).
Id. The Tenth Circuit continued to distinguish between a Crawford issue and an evidentiary issue regarding prior testimony:
[The defendant] also claims testimony in a Kansas state court preliminary hearing can never satisfy the requirements of the Confrontation Clause because the purpose of a preliminary hearing under Kansas law is limited to determining the existence of probable cause. This argument is unavailing because the Supreme Court has held testimony from a preliminary hearing can be admitted without violating the Confrontation Clause despite the fact the function of a preliminary hearing “is ... determining whether probable cause exists-” What matters under the Confrontation Clause is whether the defendant had a prior opportunity to cross-examine the witness. Under Kansas law, “[t]he defendant has the right to cross-examine witnesses against him and introduce evidence on his behalf [at the preliminary examination].” [The defendant] had the right and he exercised that right.
Id. at 779 (citations and footnotes omitted); see also O’Neal v. Province, 415 Fed.Appx. 921, 924 (10th Cir.2011) (“[U]nder Crawford, a preliminary hearing affords sufficient opportunity for cross-examination .... ”); Samayoa v. Ayers, 649 F.Supp.2d 1102, 1145 (S.D.Cal.2009) (“ ‘[Sjimilar motive’ is a state evidentiary requirement, and not a requirement under the Confrontation Clause. The Supreme Court has refrained from conducting any similar motive inquiry in their [sic] Sixth Amendment cases .... ”).
Thus, the Tenth Circuit has found that the opportunity for cross-examination under the Confrontation Clause is not the same as that contemplated under the Federal Rules of Evidence, which requires similarity of motive to develop testimony. The same is true in Florida and in the instant case — the rules of evidence for Florida and the Florida common law may require that prior testimony only be admitted if there is similarity of motive to develop testimony, but that is a separate analysis from Crawford and the Confrontation Clause. Petit’s argument below was clearly and unambiguously a Crawford objection alone.
Therefore, the trial court did not err in admitting Joseph’s prior testimony at the bond hearing over Petit’s Crawford objection. Joseph’s statements were testimonial and therefore fell within the ambit of Crawford’s application of the Confrontation Clause. However, the state demonstrated that Joseph was unavailable for trial, and Petit had an opportunity to cross-examine Joseph at the bond hearing, which his counsel took. Therefore, Crawford was satisfied.

The Four 911 Calls

“An appellate court employs a mixed standard of review in considering a trial court’s ruling on the admissibility of evidence over an objection based on the Confrontation Clause.” Hernandez v. State, 946 So.2d 1270, 1277 (Fla. 2d DCA 2007). As such, the trial court’s factual findings must be supported by competent, substantial evidence; the trial court’s legal conclusions, however, are subject to de novo review. Id. In the matter of the 911 calls, the only issue presented is whether the calls were testimonial or nontestimoni *914 al. This is a legal question, and therefore we approach it de novo.
The Supreme Court in Crawford purposefully declined to provide any definition for “testimonial.” Crawford, 541 U.S. at 68, 124 S.Ct. 1354 (“We leave for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ”). Approximately two years after Crawford was decided, however, the Supreme Court provided further guidance as to what constitutes testimonial and nontestimonial statements in Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
In Davis, the statements at issue came from a 911 call[4] made by a victim of domestic violence who was in the process of being abused by her former boyfriend. Id. at 817. The victim told the 911 operator, “He’s here jumpin’ on me again.” The victim then said that the former boyfriend was “runnin’ now.” The operator asked the victim a number of questions about the former' boyfriend’s identity and whereabouts.
The Court concluded that those statements made to the 911 operator were non-testimonial and therefore admitting them did not violate the Confrontation Clause. The Court stated the following standard:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Davis, 547 U.S. at 822, 126 S.Ct. 2266.
The Court also considered a separate case, Hammon v. Indiana, reported with Davis. Id. at 819. In Hammon, the statements at issue were made directly to police officers and did not involve 911 calls. The police responded to a reported domestic disturbance. They found the victim, appearing frightened, alone on the front porch, but she told the police that “nothing was the matter.” She gave the police permission to enter the house and they found the victim’s husband in the kitchen. The officers questioned both the victim and her husband in separate rooms and these statements to police were the ones at issue.[5] The Court found that the statements were testimonial:
Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial.
Id. at 830.
The Court in Davis emphasized that its analysis was constrained by the facts presented to it in the case and stated that it was not “attempting to produce an exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation — as either testimonial or nontestimonial.” Id. at 822.
*915 Recently, in Michigan v. Bryant, — U.S. —, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), the Supreme Court offered a further refinement of its Crawford/Davis jurisprudence. The Court explained that determining “whether an emergency exists and is ongoing is a highly context-dependent inquiry.” Id. at 1158. The Court explained the “primary purpose test” as follows:
To determine whether the “primary purpose” of an interrogation is “to enable police assistance to meet an ongoing emergency,” which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties.
Id. at 1156 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266).
Continuing, the Court reiterated that the subjective or actual intentions of the individuals involved is not a consideration. Instead, the primary consideration is whether “the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief [is] later proved incorrect.” Id. at 1157 n. 8.
The Court also explained the narrowness of its prior holding in Davis. Because Davis and Hammon involved “domestic violence, a known and identified perpetrator, and, in Hammon, a neutralized threat,” the Court had “focused only on the threat to the victims and assessed the ongoing emergency from the perspective of whether there was a continuing threat to them.” Id. at 1158. Importantly, the Court found:
Domestic violence cases like Davis and Hammon often have a narrower zone of potential victims than cases involving threats to public safety. An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.
Id. The Court also reiterated that “the existence vel non of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the ‘primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency.’ ” Id. at 1165 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266).
The Court then provided a nonex-haustive list of considerations which may aid courts in determining whether an emergency is ongoing: (1) whether an armed assailant poses a substantial threat to the public at large, see id. at 1158; (2) the type of weapon used by the assailant, see id. at 1158-59; (3) the severity of the victim’s injuries, see id. at 1159; (4) the formality of the interrogation, see id. at 1160; and (5) the involved parties’ statements and actions. See id. Finally, the Court reiterated its observation in Davis that “ ‘a conversation which begins as an interrogation to determine the need for emergency assistance’ can ‘evolve into testimonial statements.’ ” Id. at 1159 (quoting Davis, 547 U.S. at 828, 126 S.Ct. 2266).
With this guidance in mind, we now address whether the four 911 calls introduced in the instant case were testimonial or nontestimonial. This determination hinges on whether the questions from the 911 operator occurred during the context of an ongoing emergency and were designed “to enable police assistance to meet [the] ongoing emergency.” Bryant, 131 S.Ct. at 1165.
The first 911 call was from an unknown individual calling to report the robbery. It was a very brief conversation, in which the caller made semi-coherent statements to the 911 operator. The caller stated that he or she was at a food store *916 and saw “the car pulled up and guns and all.” The caller said he or she did not know what was going on. The caller then disconnected the call.
During the first call, the 911 operator only asked very preliminary questions trying to discern what the caller was trying to report. From the brief and discombobulated statements made by the caller, the situation appeared to involve armed suspects, but based on the brevity of the call and the caller’s difficulty making coherent sentences it would be unclear what was actually happening from this call—-just that some situation involving guns was occurring or had occurred. We have no trouble concluding that the primary purpose of the 911 operator’s questions was to determine whether an ongoing emergency existed in the first place and thus the statements from this call were nontestimo-nial.
In the second call, which was also very brief, the 911 operator reversed the call to get the caller back on the line. The operator asked basic questions such as what type of vehicle the suspects drove, what they did during the robbery, how many suspects were present, and what weapons they brandished. In this call, the 911 operator’s questions were once again designed to gather basic background information to determine if an ongoing emergency even existed. The statements during this call were also nontestimonial.
The third call occurred when Saint Remy called 911 to report the robbery as he and Joseph were pursuing the suspects on 1-95. Initially the 911 operator was unclear as to what the caller was reporting, so the first few questions were preliminary in nature. Once the operator discerned that Saint Remy was in a vehicle pursuing another vehicle containing multiple armed robbers down a major interstate highway at presumably high speeds, the operator then attempted to convince Saint Remy to stop following the suspects because it was dangerous.
Petit argues that this call could not relate to an ongoing emergency because Saint Remy’s actions—chasing the suspects down 1-95—in effect created (or extended) the emergency situation. However, the Supreme Court in Bryant held that the subjective intent of the parties is not relevant. Instead, the proper analysis is whether “the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief [is] later proved incorrect.” Bryant, 131 S.Ct. at 1157 n. 8. The 911 operator had limited information, mainly that the victims of a robbery were pursuing another vehicle containing multiple armed suspects down an interstate highway. This was also an informal interrogation, whose primary purpose appears to have been to convince Saint Remy to cease his pursuit. A reasonable person, when faced with these facts, would believe that an emergency was ongoing. Thus, the statements from this call were nontestimonial.
The fourth 911 call is admittedly more difficult to analyze. It is substantially lengthier than the prior three calls, lasting approximately fifteen minutes. After the third call was abruptly disconnected, the 911 operator reversed the call to Saint Remy. The call ended when Saint Remy followed the suspects off 1-95 and came upon the recent wreckage of the suspects’ collision with another vehicle.
We note first that multiple armed suspects were still on the loose, posing a substantial risk to the public at large. Indeed, this substantial risk to the public culminated in the armed suspects causing a collision that took one life and grievously injured multiple third parties. Exacerbating the situation, two of the robbery victims were speedily pursuing the armed *917 suspects on a major public highway. Saint Remy told the 911 operator that the suspects were speeding and driving erratically. If these circumstances cannot be classified as an ongoing emergency, we have trouble imagining what would.
While we have little difficulty concluding that the circumstances, as known to the parties at the time, constituted an “ongoing emergency,” this determination does not end our analysis. We must now decide “whether the ‘primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency.’ ” Bryant, 181 S.Ct. at 1165 (quoting Davis, 547 U.S. at 822). In the fourth call, the 911 operator repeatedly asked for updates from Saint Remy regarding his location on 1-95. The 911 operator also asked about the suspects’ location multiple times as well. At some point, Saint Remy informed the 911 operator that the suspects were being pursued by police vehicles in a high-speed chase. The 911 operator’s questions appear designed primarily to obtain a continual stream of information from Saint Remy about his and the suspects’ whereabouts. The suspects were attempting to elude the police and engaged in a high-speed chase. The questions that the 911 operator asked Saint Remy were designed to assist the police in identifying and locating a car full of armed robbers. In other words, the primary purpose of the interrogation was “to enable police assistance to meet [the] ongoing emergency.” Id. As such, the statements from the fourth 911 call were nontestimonial, and admitting them at trial did not violate the Confrontation Clause. Finally, even assuming the last of the 911 calls was an abuse of discretion to admit, any error would be harmless, since there is “no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

Affirmed.

GERBER and LEVINE, JJ., concur.

. The bond hearing was held pursuant to State v. Arthur, 390 So.2d 717 (Fla.1980).

. The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with witnesses against him.” Amend. VI, U.S. Const.

. Our supreme court has opined, in a case involving very different facts, that one circumstance which satisfies the confrontation requirement is "where the opportunity [for cross-examination] is exercised, is more than 'de minimis,' and is 'the equivalent of signifi *912 cant cross-examination.' " State v. Contreras, 979 So.2d 896, 909 (Fla.2008) (quoting Ohio v. Roberts, 448 U.S. 56, 70, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). In the instant case, cross-examination did occur at the bond hearing, it was more than “de minimis,” and we do not have trouble characterizing it as the equivalent of significant cross-examination.

. In a footnote, the Court considered 911 operators the functional equivalent of law enforcement officers for Confrontation Clause purposes. Davis, 547 U.S. at 823 n. 2.

. The victim subsequently refused to testify against her husband.