DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ANTHONY MOSCATIELLO,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-3695

[June 6, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Ilona Maxine Holmes, Judge; L.T. Case No. 05-015875 CF10A.

J. Rafael Rodriguez of the Law Offices of J. Rafael Rodriguez, Miami, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Melanie Dale Surber, Assistant Attorney General, West Palm Beach, for appellee.

WARNER, J.

This is an appeal from appellant's conviction for premeditated murder and conspiracy to commit first degree murder. Although appellant raises many issues, one requires reversal. The trial court allowed into evidence, over the objection of the defense, the testimony of a witness at a bond hearing for appellant, where the witness had died subsequent to the bond hearing. In his testimony, the witness related statements by John Gurino which amounted to an admission that Gurino was the shooter in the murder and that he "got the work from Moscatiello [appellant]." We conclude that this statement—that Gurino "got the work from Moscatiello," which featured prominently in both the opening and closing arguments of the State, was inadmissible hearsay. Because the State has not shown that it was harmless beyond a reasonable doubt, we must reverse.

### *The Murder*

On February 6, 2001, Gus Boulis, a successful businessman, left his office in Broward County around 9 p.m. As he was heading south on

Miami Road, a car stopped in front of him. Boulis stopped his vehicle, and another car pulled in behind Boulis so that he was boxed in. An innocent bystander was in a third car that stopped behind the first two cars. A red Jetta pulled up behind the bystander's car. While they were all stopped in a row, a black Mustang came from the opposite direction, and pulled up next to Boulis's vehicle. Someone in the Mustang fired several shots, killing Boulis. After the shooting, the bystander noticed that the red Jetta behind him drove off the road around him, and then took off. Later, he saw the red Jetta circling the block, perhaps looking for him. The bystander memorized the partial tag number of the temporary tag on the Mustang and, when he got home, called 911. Testimony revealed that both the Mustang and the Jetta were owned by Anthony "Little Tony" Ferrari, a co-defendant in this case.

The next day Dwayne Nicholson, an employee of Ferrari, called to report his knowledge about the murder. Eventually, he gave several statements implicating both Ferrari and Anthony "Big Tony" Moscatiello (appellant) in the murder. Thus, from 2001, the authorities knew of evidence connecting appellant to the murder. It took an additional four years for them to gather all the evidence and indict him, along with Ferrari and James Fiorillo, another employee of Ferrari, for the murder.

The State's theory of the case was that Moscatiello and Ferrari were hired by Adam Kidan to protect him from Boulis, from whom Kidan had purchased a business. For reasons somewhat unclear, Moscatiello determined that Boulis needed to be killed so that Moscatiello and Ferrari would not lose the protection payments from Kidan. The complicated story commences with the sale of the business from Boulis to Kidan. While there was some documentary evidence supporting meetings and payments, the direct testimony linking Moscatiello to the crime all came from witnesses each of whom received substantial benefits for their testimony.

## The Prelude to the Murder

The victim, Gus Boulis, had become successful as the owner of Miami Subs sandwich shops before founding SunCruz Casinos, a fleet of gambling casino boats. Eventually, the Attorney General's office advised Boulis that he had to sell SunCruz because he wasn't an American citizen when he started the business. As a result, Boulis sold the business to Adam Kidan and Jack Abramoff. Boulis received $23 million in cash and was supposed to get another $20 million, which he never received. The business relationship between Boulis and Kidan soured. Kidan was afraid that Boulis might harm him in retaliation for lack of payment, so he reached out to his connections in New York, and asked Moscatiello to

2

assist him. Kidan wanted the word out that he, Kidan, had "connections." Moscatiello introduced Kidan to Ferrari in Miami to provide security or protection. Ferrari bragged to people that he was John Gotti's nephew and head of the Gambino family in Florida.[1] For this protection, Kidan entered into a deal with Moscatiello for Moscatiello to be a "consultant" supplying beverages and paper goods for the gambling casino boat. Through Ferrari's business in Miami, Ferrari would arrange for Kidan's protection. Kidan paid Moscatiello monthly for the protection.

In November 2000, Moscatiello flew to Miami. Ferrari brought along Dwayne Nicholson and several other bodyguards as security to pick up Moscatiello from the airport. Ferrari, Moscatiello, and Nicholson rode in one vehicle, while the rest of the security team rode in others. While they were driving to a hotel, Nicholson testified that Ferrari and Moscatiello discussed the fact that they did not want to pay Boulis the extra money he was owed on the sale of Sun Cruz. Ferrari responded that Nicholson would take care of Boulis. Moscatiello turned to Nicholson and said, "Now, you know what he means . . . we need Gus killed. Are you able to do it?" Nicholson did not say anything, because he thought he would be killed if he didn't agree. Ferrari had previously asked him whether he would kill Boulis, and Nicholson had declined.

The next day, Ferrari and Nicholson picked up Moscatiello and drove to the SunCruz office to show Nicholson the office, the ships, and the vehicle that Boulis drove. Moscatiello said that Boulis had to be taken care of prior to an upcoming court date. After Moscatiello was dropped off, Nicholson again complained to Ferrari that he wasn't going to kill Boulis. Ferrari told him just to surveil Boulis, and he would figure out later what to do.

Meanwhile, Kidan became frustrated with his relationship with Ferrari and his protection service. While Kidan was out of the country, he terminated his relationship with Ferrari. That same day, Boulis was killed.

### The Murder and its Aftermath

James Fiorillo was another assistant to Ferrari, who was more like a son to him. Fiorillo did multiple errands for Ferrari and other tasks. On the day of the murder, Fiorillo arrived at Ferrari's home in a black Mustang belonging to Ferrari, which Fiorillo frequently drove. He then switched vehicles with Ferrari. Ferrari drove away, and Ferrari's girlfriend followed in his red Jetta. Fiorillo also had access to several of Ferrari's phones.

---

[1] John Gotti was the boss of the Gambino crime family in New York.

Although the innocent bystander witnessed the murder, he could not identify anyone in any of the vehicles. The partial license number he obtained did match up to the black Mustang. Thus, no independent witness testified as to who was present at the scene. However, Fiorillo knew about the murder and what occurred.

Fiorillo went to Ferrari's home after the murder. Ferrari gave him a bag containing a gun, which Fiorillo disposed of. Fiorillo also drove the Mustang to a repair shop. The next day, Fiorillo met with Ferrari and Moscatiello at a hotel. Moscatiello told Fiorillo to drive to New York and to report the Mustang as stolen, which he did. In New York, Fiorillo met with Moscatiello. When Moscatiello asked for the details of the events leading up to the murder and the murder itself, Moscatiello became very angry. He told Fiorillo to stay in New York, and Ferrari's girlfriend allowed Fiorillo to stay with her for a week there, after which he stayed in a hotel. Fiorillo worked for Moscatiello for a while and then returned to Florida sometime in April. Ultimately, Fiorillo was arrested and charged with conspiracy to commit murder for which the State was seeking the death penalty, as the State originally believed that he was the shooter. He reached a plea deal in which he agreed to testify against Moscatiello and Ferrari in exchange for a six-year prison sentence.

When Kidan returned to Florida after the murder, he met Moscatiello in his hotel room and asked if he knew what happened. Moscatiello said, "Yes, it was very unfortunate, it wasn't supposed to happen that way." Moscatiello admitted that it was his decision. He explained that the plan was to kidnap Boulis, kill him, and bury his body on a farm where he would not be found for years. Kidan asked who was involved, and Moscatiello told him that the shooter came down from New York and went home on Amtrak. Fiorillo drove the car, and Ferrari was in another car. Kidan knew that a Mustang had been used in the murder and he knew Fiorillo had one, so he asked Moscatiello if that was the same car. Moscatiello told him it was the same Mustang. Kidan complained that that car should not have been used.

Kidan had made significant payments to both Moscatiello and Ferrari for protection. In June 2001, Kidan made a last payment, and then SunCruz went into bankruptcy. Later, Kidan was being investigated by the FBI in connection with the murder. In April 2004, Kidan met Moscatiello in New York and explained that he was being investigated by the government. He told Moscatiello that he thought someone was cooperating with the government. Kidan asked about the shooter, and Moscatiello told him that the shooter had died after he was shot in a deli

in Boca Raton.  Kidan googled the incident and discovered that the man who had been shot was named John Gurino.[2]

Kidan was convicted of wire fraud in connection with the SunCruz purchase and sale and went to prison in 2006.  He contacted law enforcement about cooperating in the Boulis murder investigation in 2006, and his original sentence of five years was cut to twenty-seven months.  He testified against Moscatiello at the trial, giving details of the SunCruz sale and Moscatiello's activities.

## Nicholson Contacts Law Enforcement and Investigation Commences

The day after the murder, Nicholson was watching the news and saw that Gus Boulis had been killed, and police were looking for a black Mustang.  Nicholson knew that Fiorillo usually drove the Mustang.  He was afraid that he might be killed next, so he called Crime Stoppers.  He was put in touch with law enforcement, and gave a statement to Fort Lauderdale police on February 9, 2001.

Police asked Nicholson to call Ferrari by phone, which they attempted to record without success.  Then police asked him to meet with Ferrari while wear a listening device hidden inside a beeper.  When Nicholson met with Ferrari, Ferrari grabbed the beeper and asked about it.  Nicholson told him his girlfriend had given it to him to keep track of him.

Thereafter, Nicholson tried to avoid Ferrari, although he was still owed money for his work for Ferrari.  Around Memorial Day, another of Ferrari's assistants, Ben Potter, came by Nicholson's house to tell him that Ferrari wanted to speak to him.  Nicholson, Fiorillo, and Potter drove to Ferrari's mother's house in Venice, Florida.  On the way, Fiorillo asked Nicholson if he (Nicholson) was going to kill him (Fiorillo).  Nicholson responded that he thought Fiorillo and Potter were going to kill him (Nicholson).  At Ferrari's mother's home, Ferrari told Fiorillo that he was "running his mouth" too much, referring to Fiorillo's recent trip to New York.

Sometime after Memorial Day, Nicholson confronted Ferrari about money Ferrari still owed him for his services.  Ferrari called Moscatiello about the money, and put the call on speaker phone.  When Ferrari asked him about the money, Moscatiello answered, "F*ck those n****rs, just kill them."  Nicholson never got his money.

---

[2] This was later confirmed, through testimony at trial, from the man who shot Gurino at the deli.

Nicholson was never charged with any crime as a result of his interactions with Ferrari and Moscatiello.  He received a six figure Crime Stopper's reward for his assistance.  He also testified against Moscatiello.

**The State's Other Evidence Connecting Moscatiello to the Murder**

In 2007, several years after Moscatiello and Ferrari had been charged, Joseph Marley wrote a letter to the state attorney offering information regarding Moscatiello.  Marley had been in custody in the county jail for over two years on a drug trafficking charge.  His crimes could have resulted in a seventy-five year sentence.  Looking for leniency, he negotiated a plea in exchange for his information and testimony, which allowed him to be sentenced to time served and to be released upon pleading to the charges.

Marley was a limousine driver in New York, and would hang out at clubs owned by John Gotti.  He would see Moscatiello at those clubs. Marley used to work for Anthony and Michael Gurino, who were cousins of John Gurino, who became the suspected gunman in the Boulis murder. About six weeks after the Boulis murder, Marley ran into John Gurino at the Coconut Creek casino.  Gurino kissed him and said he (Gurino) had a new nickname, "SunCruz Kid."  At first Marley didn't know what he was talking about, and Gurino said "Don't you read the papers?"  Then it dawned on Marley that he was referring to the murder of Gus Boulis, which he had seen reports of on television.  Marley asked, "Was that you?" Gurino looked at him with a smirk, which Marley interpreted as a "yeah." And, Marley said, "What were you doing, shaking him down?"  Gurino laughed and said, "Something like that.  I got the work from Moscatiello." In 2003, John Gurino was himself murdered in a Boca Raton deli.

The State also read the testimony of Nick DiMaggio, who was in a federal witness protection program and unavailable.  He had testified in prior proceedings involving the Boulis murder.  DiMaggio was a lifetime criminal and had known Moscatiello his whole life.  He also knew John Gurino, who was his best friend.  In 2000 or 2001, Moscatiello had asked DiMaggio to stop by his house in New York.  During their meeting, Moscatiello offered him $100,000 to go to Florida and kill Gus Boulis. Moscatiello explained that Boulis was making a lot of problems with a gambling business and a lot of money was at stake. DiMaggio was insulted because he was being asked to kill someone for money rather than for "principle."  He left the meeting and told Gurino about the offer.  Later, he became aware that Boulis was in fact killed when he received a news article about the murder, sent to him by Gurino.  A few weeks later, DiMaggio spoke with Moscatiello in New York, and Moscatiello told him "he took care of it."  However, Gurino never told DiMaggio that he had shot Boulis, and

DiMaggio would have been shocked if he did, as Gurino lived by the same principles as DiMaggio. DiMaggio testified as part of a plea negotiation, which required him to testify in this case and others. For his testimony in various proceedings, including this one, the government did not charge him with multiple crimes, which included murders. He was held in custody for nearly seven years, but at sentencing, he received a sentence of only a year. He was released to the witness protection program.

Finally, Paul Brandreth, a convicted felon in federal prison for a drug crime and for second degree murder in a state prosecution, testified that he was approached by Ferrari to kill three people, including a black man (Nicholson) and a woman (Ferrari's girlfriend), both of whom lived in South Florida, and a person in a hotel in Yonkers (Fiorillo), for whom law enforcement was looking. Ferrari needed Brandreth to get to Fiorillo before the investigators did. Brandreth travelled to New York and stayed with Fiorillo, ostensibly for Fiorillo's protection. When Brandreth arrived, he was picked up at the airport by Moscatiello. Moscatiello said to him, "so you're the one, kid, huh? You're the one, nothing but a f*cking hat trick for you. Nothing but a Trifecta." Brandreth knew he was referring to the three people Brandreth was supposed to "whack." He asked Moscatiello for his money. Moscatiello replied, "What do you mean? I thought the other Tony took care of you." Brandreth told him he needed a "paintbrush" which was code for a gun. Moscatiello said that he didn't have a gun, but he had "a shotgun from a fed job he did one time." Moscatiello told him to wait for a phone call, but not to kill Fiorillo at the hotel because he owned the hotel. Brandreth stayed with Fiorillo, but never got a phone call or gun. He returned to Florida. In 2012, he was visited by two officers while he was in prison for murder and federal charges. In his state murder case, prosecutors agreed to have his state sentence terminate when his federal sentence terminated in exchange for his testimony in this case, significantly reducing his prison time.

The State rested, and Moscatiello did not call any witnesses. Nevertheless, the defense had extensively cross-examined the witnesses and impeached the witnesses in significant respects. Throughout the trial, the defense claimed that all of the witnesses were lying and making up stories to avoid their own prosecutions. The jury deliberated for two days and then found Moscatiello guilty of murder and conspiracy to commit murder. The court sentenced him to life imprisonment on the murder conviction and to thirty years concurrent on the conspiracy to commit first degree murder. He now appeals.

Moscatiello argues that the court erred in admitting the testimony of Joseph Marley, which had been given at a bond hearing, claiming that it

was inadmissible hearsay and a violation of the Confrontation Clause. Marley, who was deceased by the time of trial, had earlier testified at a bond hearing regarding the conversation with John Gurino, who was also deceased by the time of trial. The trial court admitted the testimony under section 90.804(2)(a) and (c), Florida Statutes (2013), under the former testimony and statement against interest exceptions to the hearsay rule.

Evidentiary rulings are reviewed for abuse of discretion as limited by the rules of evidence. *Nardone v. State*, 798 So. 2d 870, 874 (Fla. 4th DCA 2001). Whether evidence is hearsay or admissible under an exception to the hearsay rule is a question of law subject to de novo review. *Browne v. State*, 132 So. 3d 312, 316 (Fla. 4th DCA 2014); *Powell v. State*, 99 So. 3d 570, 573 (Fla. 1st DCA 2012).

Moscatiello claims that the testimony of Marley constituted hearsay within hearsay, as both Marley and Gurino were unavailable to testify. Section 90.805, Florida Statutes, allows the admission of hearsay statements within hearsay, as long as "each part of the combined statements conforms with an exception to the hearsay rule as provided in s. 90.803 or s. 90.804." We examine whether Marley's testimony can be allowed under the former testimony exception of section 90.804(2)(a), Florida Statutes (2013), and whether Gurino's statements are admissible as statements against interest under section 90.804(2)(c), Florida Statutes (2013).

Moscatiello concedes that testimony at a bond hearing may qualify as former testimony. *See Petit v. State*, 92 So. 3d 906, 912-13 (Fla. 4th DCA 2012)*; Roussonicolos v. State*, 59 So. 3d 238, 241-43 (Fla. 4th DCA 2011). However, he claims that he did not have the same opportunity or motive to question Marley at the bond hearing as he would have at trial. We disagree.

Florida Rule of Evidence 90.804(2)(a), Florida Statutes (2013), permits the use of former testimony "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." As we noted in *Roussonicolos*, at a bond hearing, "the purpose of the hearing [is] for the court to consider whether [the defendant] should be released and, if so, what conditions should be imposed pending his final [] trial." 59 So. 3d at 242; *see also Petit*.

In this case, Moscatiello had requested an *Arthur* hearing seeking his release pending trial. *See State v. Arthur*, 390 So. 2d 717 (Fla. 1980). One of the issues involved in such a hearing is that the State must prove that

"the proof of guilt is evident or the presumption great." *Id.* at 717. Where the State presents evidence of the defendant's guilt, but the evidence is contradicted in material respects, the State has not met its burden. *See State v. Perry*, 605 So. 2d 94, 99 (Fla. 3d DCA 1992). In order to secure release, the defendant has every incentive to cross-examine the witnesses to show conflicts and contradictions in the evidence. *Id.* at 97-98. Moscatiello had a "similar motive" at the bond hearing, as he would have at trial, to discredit the witness, and he had the opportunity to cross-examine the witness. That he may not have done so does not render the testimony inadmissible, as he was given the *opportunity* for effective cross-examination. *See Petit*, 92 So. 3d at 912. Actually, the defense attorney did extensively cross-examine Marley and developed substantial discrediting information, including the fact that Marley had come forward to the prosecution to reduce his own charges. Therefore, the *Arthur* hearing satisfied the requirement of section 90.804(2)(a).

Further, we reject Moscatiello's contention that the trial court must also make a preliminary finding that the testimony is trustworthy before admitting it. No such requirement is contained within section 90.804(2)(a), unlike section 90.804(2)(c), where the admissibility of a statement against penal interest is conditioned on its trustworthiness. Where the witness can be challenged by cross-examination to ferret out inconsistencies and contradictions, the search for the truth has occurred.

The statements of Gurino, to which Marley testified, are also hearsay, and Moscatiello claims they did not fall within the statement against interest exception to the rule. The trial court found that they qualified as statements against penal interest, and thus, would have been admissible under section 90.804(2)(c). That rule allows the admission of certain statements of a declarant when the declarant is unavailable, as Gurino was because of his death. These include:

> (c) Statement against interest.--A statement which, at the time of its making, . . . tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true.

In *Brooks v. State*, 787 So. 2d 765 (Fla. 2001), our supreme court considered this rule in connection with a non-testifying co-defendant's confession which also inculpated the defendant. In discussing the rule, the court said:

> "The reliability of these statements [against penal interest] flows from the fact that they are against the interest of the declarant at the time when they are made [as well as the presumption that a] person does not make statements which will subject him or her to civil or criminal sanctions unless they are true." Charles W. Ehrhardt, *Florida Evidence* § 804.4 (2000 ed.); *see also Williamson v. United States*, 512 U.S. 594, 599, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994) . . . .

*Id.* at 774 (first bracket added; second bracket in original). The court then provided the following guidance: "Therefore, assuming the other requirements of section 90.804(2)(c) are met, it follows that a nontestifying codefendant or accomplice's confession or inculpatory statement which also implicates the defendant should only be admitted if it 'sensibly and fairly can be redacted to include only those statements which are solely self-inculpatory.' *Franqui v. State*, 699 So. 2d 1332, 1339 (Fla. 1997)." *Id.* at 775. In other words, only those self-inculpatory portions of a declarant's statement meet the requirements of section 90.804(2)(b). Thus, those portions which are non-self-inculpatory are not admissible pursuant to this section. *See Williamson*, 512 U.S. at 599-600 (holding that a similar federal rule applies narrowly only to those declarations or remarks in a confession that are individually self-inculpatory).

Following *Brooks,* several courts have held that non-self-inculpatory statements within a witness's narrative are inadmissible as statements against interest, where they implicate another in the crime. The court in *Antunes-Salgado v. State*, 987 So. 2d 222, 226 (Fla. 2d DCA 2008), held "while [the appellant's] codefendants' statements were partially self-inculpatory, the State also presented those portions of the statements that implicated Antunes-Salgado and that shifted the majority of the guilt to him. These portions of the statements were inadmissible under section 90.804(2)(c) and *Lilly* [*v. Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999)] and *Williamson* . . . ."

In *Perez v. State*, 980 So. 2d 1126, 1132 (Fla. 3d DCA 2008), a non-testifying declarant (Laurencio) admitted to a friend (Martin) that he had committed the robbery in question, and "The Fish" accompanied him. The Fish was a person associated with the defendant, Perez, and was a material link in State's case against Perez. *Id.* at 1129. Relying on *Williamson* and *Brooks,* the court agreed that the first part of the statement that Laurencio had committed the robbery was admissible as a statement against interest but the statement about the Fish being involved was not:

> The collateral statement by Laurencio to Martin about "The Fish" was not made against the declarant's penal interest because it was not inculpatory as to Laurencio. The statement that "The Fish" participated in the robbery was hearsay and does not fall within an exception to the rule. Therefore, Laurencio's statement concerning "The Fish's" involvement in the robbery should have been excluded from evidence before the jury and the defendant's objection should have been sustained.

*Id.* at 1133; *accord State v. Crofoot*, 97 So. 3d 866, 868 (Fla. 1st DCA 2012).

On the other hand, our court has decided two cases which held statements admissible in similar factual circumstances, but did not discuss whether portions which were non-self-inculpatory should be redacted. In *Machado v. State*, 787 So. 2d 112 (Fla. 4th DCA 2001), the State charged Machado and Olivera with robbery and murder, which involved four assailants, including Machado's uncle, Enrique, who was killed at the scene of the murder. *Id.* at 113. Enrique's son testified for the prosecution and related a conversation that Olivera had with him at his father's funeral, in which Olivera bragged that the police could not catch him. *Id.* In a later conversation with the son, Olivera explained that four men (Olivera, Enrique, the defendant Machado, and a fourth man) had ambushed the victim and the victim had shot at them. *Id.* On appeal, defendant Machado argued that Enrique's son's testimony, repeating Olivera's statements, was inadmissible hearsay. *Id.* The court rejected that argument, finding that a non-testifying accomplice's statement against penal interest was admissible as a hearsay exception, if the circumstances showed trustworthiness. *Id.* at 113-14. Because Olivera's statement, made in a personal setting, described how Enrique died and how Olivera had evaded arrest, without showing any intent to shift blame, it was trustworthy. *Id.* at 114. "A non-testifying accomplice's statement against penal interest is admissible as a hearsay exception if corroborating circumstances show the statement has 'particularized guarantees of trustworthiness.'" *Id.* at 113, quoting *Lilly v. Virginia*, 527 U.S. 116, 136-37, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999).[3] The opinion in *Machado* did not discuss whether any portion of the statement that was non-self-inculpatory should have been redacted, as not meeting the requirements

---

[3] In *Lilly*, however, the Court dealt with a challenge to such a statement as violating the Confrontation Clause, not whether it is was admissible as a statement against interest. Thus, the test from *Lilly* requiring a guarantee of trustworthiness was for those purposes. Here, the statements of Gurino were not testimonial, and thus, the Confrontation Clause did not apply.

of the section 90.804(2)(c) exception. That portion of the statement implicating Machado also appears to have been inextricably intertwined with the explanation of the crime. Also, *Machado* was also decided before our supreme court issued *Brooks*.

We considered a factually similar case in *Brown v. State*, 69 So. 3d 316 (Fla. 4th DCA 2011). There, the defendant Brown was charged with robbery and murder. *Id.* at 317. The trial court allowed a witness to testify, over objection, to a conversation he had with one of Brown's co-defendants. *Id.* at 317-18. The witness was talking to the co-defendant in the neighborhood when the co-defendant implicated himself as well as defendant Brown and the other co-defendant in the crimes. *Id.* at 317. The co-defendant explained to the witness that they had robbed the victims and then shot them after they did not comply with directions. *Id.* The objection to the statements appeared to center around their trustworthiness, as both the trial court and our court relied on *Machado* in concluding that the statements were trustworthy because, among other reasons, the co-defendant had not attempted to shift blame and the statement was made to a friend, not to authorities. We distinguished *Brooks* on the ground that it was factually dissimilar. *Id.* at 320. In *Brooks*, the non-testifying co-defendant's statement on the whole tended to shift blame and was made to authorities, making it self-serving and lacking in trustworthiness. *Id.* It does not appear from the *Brown* opinion that any argument was made that those portions of the statement which were non-self-inculpatory should have or could have been redacted.

Because the argument was not made in *Machado* and *Brown* that the statement should be redacted to eliminate those portions which are not statements against interest, we apply *Brooks*. Where the State is seeking to admit the out of court statements of co-defendants or accomplices pursuant to the requirements of section 90.804(2)(c), and some of the statements also implicate the defendant, they should not be admitted where they "sensibly and fairly can be redacted to include only those statements which are solely self-inculpatory." *Brooks*, 787 So. 2d at 775 (citing *Franqui*, 699 So. 2d at 1339).

The statements in *Machado* and *Brown* appear to be so intertwined with the statement against penal interest of the co-defendant that they may not have been able to be redacted. In this case, however, we conclude that they can be, and should have been, redacted. Marley's testimony that Gurino called himself the "SunCruz kid" was admissible as a statement against penal interest. But Gurino's statement that "I got the work from Moscatiello" implicated another defendant, and was not solely self-inculpatory. It did not satisfy the requirements of section 90.804(2)(c) or

12

the requirements of *Brooks*. It could have been omitted and still "sensibly and fairly" provided the information from Gurino as to his participation in the crime without implicating Moscatiello. The trial court erred in admitting this statement at trial.

*State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986) requires that the State must carry the burden of showing that an error is harmless beyond a reasonable doubt. *DiGuilio* cites with approval to Chief Justice Traynor's observations regarding harmless error:

> Overwhelming evidence of guilt does not negate the fact that an error that constituted a substantial part of the prosecution's case may have played a substantial part in the jury's deliberation and thus contributed to the actual verdict reached, for the jury may have reached its verdict because of the error without considering other reasons untainted by error that would have supported the same result.

*Id.* at 1136, citing *People v. Ross*, 67 Cal. 2d 64, 429 P.2d 606, 621, 60 Cal. Rptr. 254, 269 (1967) (Traynor, J., dissenting).

It is hard to avoid the conclusion that the inadmissible statement implicating Moscatiello constituted "a substantial part of the prosecution's case." The State placed great emphasis on Gurino's statement to Marley. The prosecutor made it the last point in opening statement and the first statement in closing argument. In fact, the prosecutor's closing argument began: "I got the work from Moscatiello." The prosecutor spent the first several minutes of closing argument discussing these statements from Marley, and stating, "It identifies Mr. Moscatiello as the person who brings Mr. Gurino in." While other witnesses also tied Moscatiello to Gurino, none were quite as direct as Marley's statement about what Gurino had told him. And most of the key witnesses in the case had made deals with the State for their testimony, thus impacting their credibility. Many of them had made those deals after Moscatiello had been indicted, and at a time when the State had developed Fiorillo as the shooter. The defense made much of the lack of credibility of the witnesses and the shifting theories of the State. The jury requested a readback of Marley's testimony, although it later withdrew the request, but it highlights the significance of that testimony to the jurors. They deliberated for nearly two days before reaching their verdict.

Given the substantial issues of credibility of all of the major witnesses in the case, we cannot say that the State has shown beyond a reasonable doubt that the error in admitting Gurino's statement was harmless. *See*

13

*Shivers v. State*, 900 So. 2d 615, 618 (Fla. 1st DCA 2005) (finding the erroneous admission of an affidavit was not harmless error where the State made it a feature of closing argument). We are mindful that there is plenty of evidence of Moscatiello's guilt. But our supreme court has consistently stated that overwhelming evidence is not the test, particularly where the erroneously admitted evidence becomes a focal point of the trial. *See State v. Lee,* 531 So. 2d 133 (Fla. 1988). We are constrained by these rulings.

As to the remaining issues raised, we affirm. But, because we cannot conclude that the error in admitting Gurino's statement regarding Moscatiello is harmless under *DiGuilio*, we reverse for a new trial.

GROSS and TAYLOR, JJ., concur.

*        *        *

**Not final until disposition of timely filed motion for rehearing.**